**UNITED STATES of America**

v.

**Juan Carlos SERRANO, Wilmer Serrano, Peter Gonzalez, Eric Martinez, Raul Martinez, Manoa Vargas, Donnie Black, and Troy Phillips, Defendants.**

No. 05 CR 748(SAS).

United States District Court, S.D. New York.

May 23, 2006.

Mark P. Goodman, Eric D. Meyer, Debevoise & Plimpton LLP, New York City, for Juan Carlos Serrano.

Roger L. Stavis, Oren L. Sibony, Stavis & Kornfeld LLP, New York City, for Wilmer Serrano.

Donald H. Vogelman, New York City, for Manoa Vargas.

Katherine Goldstein, Assistant U.S. Attorney, New York City, for the Government.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendants Juan Carlos Serrano, Wilmer Serrano and Manoa Vargas move to suppress all evidence obtained from allegedly improper electronic surveillance. Defendants argue that the warrants for electronic surveillance were improperly granted in violation of New York Criminal Procedure Law ("CPL") § 700.20, 18 U.S.C. § 2518, and the Fourth Amendment to the United States Constitution. The Government opposes these motions on the ground that all statutory requirements for obtaining eavesdropping warrants have been met. For the following reasons, defendants' motions are denied.

## I. BACKGROUND

### A. The Investigation

In January 2004, the Dutchess County Drug Task Force ("DCDTF") and the New York State Police ("NYSP") began an investigation into the drug distribution activities of Juan Carlos Serrano ("Serrano") and his associates.[1] The investigation intensified when a confidential source purchased small quantities of cocaine in October and December 2004, from a person who later became a confidential informant ("CI").[2] The CI began cooperating with state law enforcement in December 2004, after having been arrested for selling cocaine to the confidential source.[3] At his debriefing, the CI disclosed that he previously obtained cocaine from Serrano.[4] The CI told law enforcement officers that he regularly contacts Serrano by phone and provided two cellular phone numbers for Serrano.[5] The CI also disclosed that local law enforcement officers were protecting Serrano and his drug trafficking operation.[6] This protection included information provided to Serrano regarding investigations as well as the presence of law enforcement officers along routes used by Serrano when purchasing drugs that he intended to sell in Dutchess County.[7]

On December 16, 2004, the CI telephoned Serrano to discuss purchasing one ounce of cocaine.[8] This call was recorded. Later that evening, the CI met Serrano at a pre-determined location, 146 Myers Corners Road, and purchased one thousand dollars worth of cocaine.[9] On December 20, 2004, the CI made another taped telephone call to Serrano to discuss a debt he

---

1. *See* Affidavit of NYSP Senior Investigator Michael Bryan in Support of Application for Eavesdropping Warrant dated January 21, 2005 ("Bryan State Affidavit"), Ex. A to the Government's Memorandum of Law in Opposition to Defendants' Pre–Trial Motions ("Gov't Opp."), ¶ 8.

2. *See id.* ¶¶ 11–14.

3. *See id.* ¶ 15.

4. *See id.*

5. *See* Affidavit of NYSP Special Investigator Michael Bryan in Support of Application to Intercept Wire Communications in the Southern District of New York ("Bryan Federal Affidavit"), Ex. C to Gov't Opp., ¶ 16.

6. *See* Bryan State Affidavit ¶ 15.

7. *See id.*

8. *See id.*

9. *See id.* ¶ 16.

owed to Serrano.[10] Later that evening, the CI met Serrano at his residence at 17 Creekview Court and paid him four hundred dollars.[11] The CI paid Serrano an additional one thousand dollars on January 4, 2005, again at Serrano's residence at 17 Creekview Court.[12]

State law enforcement did not arrest Serrano after the controlled purchase of cocaine by the CI, nor did they detain him for questioning or apply for a search warrant for his residence or vehicle.[13] Physical surveillance was limited to observing Serrano's interactions with the CI and following Serrano's vehicle to his home after the first transaction.[14] Nor is there any indication that state law enforcement used a pen register to determine whether Serrano ever spoke with a law enforcement officer.[15]

State law enforcement learned through its investigation that Serrano's operations were larger both in geographic scope and in quantities of drugs than initially anticipated.[16] State-authorized wire intercepts revealed that Serrano bought and sold multi-kilogram quantities of cocaine in Bronx County, New York.[17] Because the Dutchess County District Attorney's Office does not have jurisdiction in the Bronx, the state investigation was turned over to federal authorities, including the New York office of the Drug Enforcement Agency ("DEA"), in May 2005.[18] On May 26, 2005, federal investigators observed Wilmer Serrano, Peter Gonzalez, Donnie Black and Troy Phillips engage in a drug transaction which resulted in the seizure of five kilograms of cocaine.[19] The drugs seized from this transaction were the only drugs confiscated in the entire federal investigation.[20] On June 22, 2005, arrest warrants were obtained for Serrano and Wilmer Serrano, Peter Gonzalez, Eric Martinez, Raul Martinez and Manoa Vargas.[21] On July 14, 2005, all of the defendants were indicted for conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846.[22]

## B. The Wiretaps

On January 21, 2005, state law enforcement received authorization from the Honorable J. Michael Bruhn, Ulster County Court Judge, Kingston, New York, to in-

10. *See id.* ¶ 17.

11. *See id.* ¶ 18.

12. *See id.* ¶ 19.

13. *See* Memorandum of Law in Support of Defendant Juan Carlos Serrano's Motion to Suppress Electronic Surveillance Evidence ("Def.Mem.") at 2–3.

14. *See* Bryan State Affidavit ¶ 16 ("The house at 146 Myers Corners Road was under surveillance by a member of the DCDTF.... Serrano drove directly to a residence located at 17 Creekview Court in the Village of Wappinger Falls at which point the surveillance of Serrano was terminated."); ¶ 18 ("The CI left and was followed directly to 17 Creekview Court, this location in the Village of Wappinger Falls was under surveillance by agent Thomas D'Amicantonio of the DCDTF."); ¶ 19 ("Agent D'Amicantonio of the DCDTF was at a surveillance spot in the vicinity of 17 Creekview Court.").

15. *See* Def. Mem. at 3.

16. *See* Gov't Opp. at 6.

17. *See* Bryan Federal Affidavit ¶ 20.

18. *See id.* ¶ 22.

19. *See* Indictment 05 CR 748, Ex. I to the Declaration of Eric D. Meyer in Support of Defendant Juan Carlos Serrano's Motion to Suppress Electronic Surveillance Evidence ("Meyer Decl."), ¶ 3.

20. *See* Def. Mem. at 5.

21. *See* Gov't Opp. at 9.

22. *See* Indictment, Ex. I to the Meyer Decl.

tercept telephone calls over a cellular phone with call number (646) 685–9250 (the "Serrano Sprint Phone") and a cellular phone with call number (646) 418–9327 ("Phone # 2").[23] The application for this wiretap was made by William V. Grady, District Attorney for Dutchess County.[24] In support of his application were the Bryan State Affidavit and the affirmation of Matthew A. Weishaupt, Senior Assistant District Attorney for Dutchess County.[25] Interception of the Serrano Sprint Phone and Phone # 2 began on January 28, 2005.[26] State-court authorization to intercept the Serrano Sprint Phone was renewed on February 24, 2005,[27] March 23, 2005,[28] and April 21, 2005.[29] Interception of the Serrano Sprint Phone ended on May 21, 2005.[30] Investigators did not seek to extend interception of Phone # 2 beyond the initial thirty-day period authorized by the warrant.

On March 16, 2005, Judge Bruhn issued an Order authorizing the interception of communications from a cellular phone with call number (718) 593–0810 (the "Serrano Nextel Phone"), also primarily used by Serrano.[31] State interception of the Serrano Nextel Phone began on March 17, 2005 and ended on April 16, 2005.[32]

On May 25, 2005, Assistant United States Attorney Katherine Goldstein sought federal authorization to intercept the Serrano Sprint Phone and the Serrano Nextel Phone (collectively, the "Serrano Cellphones").[33] Goldstein's application was supported by the Bryan Federal Affidavit. The Honorable Harold Baer, Jr. authorized the requested interceptions the same day.[34] On June 9, 2005, authorization was obtained for interception over the cellular telephone with call number (646) 878–6805, used by Peter Gonzalez (the "Gonzalez Cellphone").[35] Federal wire surveillance over the Serran Cellphones and the Gonzalez Cellphone continued until June 23, 2005, at which point arrests had been made.[36]

23. *See* Application by William V. Grady for Eavesdropping Warrant, Ex. C to the Meyer Decl.

24. *See id.*

25. *See* Affirmation of Matthew A. Weishaupt in Support of Application for Eavesdropping, Ex. K to the Meyer Decl.

26. *See id.*

27. *See* Affirmation of Matthew A. Weishaupt, Senior Assistant District Attorney for Dutchess County, dated February 24, 2005, in Support of Application for Extension of Eavesdropping Warrant ("Weishaput State Affirmation"), Ex. B to Gov't Opp.

28. *See* Affirmation of Michael J. Kavanagh, Senior Assistant District Attorney for Dutchess County, dated March 23, 2005, in Support of Application for Extension of Eavesdropping Warrant, Ex. B to Gov't Opp.

29. *See* Affirmation of Michael J. Kavanagh, Senior Assistant District Attorney for Dutch-

ess County, dated April 21, 2005, in Support of Application for Extension of Eavesdropping Warrant, Ex. B to Gov't Opp.

30. *See* Bryan Federal Affidavit ¶ 12.

31. *See id.* ¶ 13.

32. *See id.*

33. *See* Application by Assistant U.S. Attorney Katherine Goldstein for Authorization to Intercept Wire Communications ("Goldstein Application"), Ex. D to the Meyer Decl.

34. *See* Order of Judge Harold Baer dated May 25, 2005, Ex. E to the Meyer Decl.

35. DEA Special Agent Robert Cassitta submitted an affidavit in support of the application to intercept wire communications over the Gonzalez Cellphone. *See* Ex. D to Gov't Opp.

36. *See* Gov't Opp. at 9.

## C. The Supporting Affidavits

### 1. The Bryan State Affidavit

The Bryan State Affidavit sets forth the requisite probable cause to believe that Serrano was committing drug-related crimes over the Serrano Sprint Phone. With regard to the usual procedures and techniques employed in drug trafficking investigations,[37] the Affidavit states: "These usual procedures and techniques have either failed, reasonably appear to be unlikely to succeed or would, in all likelihood, compromise the investigation."[38] The Affidavit further states that "[t]his is especially so where members of law enforcement *may be* providing information or protecting the traffickers in a variety of other ways."[39]

The Bryan State Affidavit then discusses the efficacy and viability of the above-mentioned usual investigative procedures. The Affidavit first discusses confidential sources stating that: "Reliable and confidential sources of information have been developed and used and will continue to be developed in this investigation."[40] The Affidavit then describes the following limitations with respect to the use of confidential informants:

> However, the confidential sources presently available to law enforcement, including the CI described above, have only limited information with respect to the inner workings and activities of this narcotics trafficking group. Neither the confidential informant described in this Affidavit nor any of the available confidential sources used to date have been able to identify all the members of this criminal conspiracy, sufficiently define the roles of the conspirators for the purposes of successful prosecution, effectively identify all the sources or routes used for the supply of cocaine, describe all the methods of the alleged protection which is being provided to this group, or identify all the methods of concealing or disguising the nature, location, source, control and disposition of the proceeds of the sale of illegal narcotics.[41]

The Affidavit concludes that "[e]ven if such were known, it is unlikely that all of the details of the deliveries, quantities, financial arrangements, transactions and the like could be ascertain[ed] through the use of confidential sources alone."[42] This conclusion is based on the assumption that long-term drug distributors, such as Serrano, "learn that it is best not to divulge all of the details of their illegal activities to persons beyond their 'need to know.'"[43] It is equally unlikely that Serrano would divulge the alleged law enforcement protection he received.[44]

With regard to physical surveillance, the Bryan State Affidavit states as follows:

> Surveillance, even if highly successful, does not always succeed in gathering evidence of the criminal activity that is under investigation. Although surveil-

---

**37.** Such procedures include the use of confidential informants, physical surveillance, search warrants and subpoenas, the grand jury, and telephone toll records.

**38.** Bryan State Affidavit ¶ 20.

**39.** *Id.* (emphasis added).

**40.** *Id.* ¶ 21.

**41.** *Id.*

**42.** *Id.* ¶ 21(a).

**43.** *Id.* ¶ 21(b) ("By only telling criminal associates the details they need to have knowledge of to fulfill their role in the criminal organization, the risk of exposure and detection by law enforcement for the remaining persons in the organization is decreased.").

**44.** *See id.* ¶ 21(a).

lance can confirm and sometimes photographically document meetings between alleged conspirators, on most occasions it leaves investigators with limited evidence as to the purpose of the meetings they have witnessed from a distance. At the same time, surveillance entails a high risk that the suspects will detect the investigation, thus jeopardizing the security of confidential sources and undercover agents. This risk is substantially heightened in a case where members of law enforcement *may be* providing protection to the main targets as these individuals have knowledge of surveillance operations and would be in a position to employ counter-surveillance both through information obtained through law enforcement channels and access to sophisticated equipment.[45]

The Affidavit also dismisses the use of search warrants and subpoenas on the ground that "narcotics distributors frequently do not keep permanent records of such a detailed nature which would allow law enforcement to identify the full nature and scope of their illegal activities." [46] It is also alleged that a grand jury investigation would not be successful in achieving the stated goals of this investigation because: (1) witnesses called before a grand jury would most likely invoke their Fifth Amendment privilege not to testify; (2) granting immunity would foreclose prosecution of those immunized; and (3) "the use of Grand Jury subpoenas would alert the targets to the existence of this investigation and frustrate the goals of this investigation." [47] Finally, the Affidavit rejects

the use of toll records because call detail records "do not identify the persons using the instruments, nor do they provide the content of the communications taking place over said instruments." [48]

The Bryan State Affidavit offers Bryan's opinion that "conventional investigative techniques have not provided, and will not provide, the means to achieve all the desired objectives in this investigation." [49] The Affidavit concludes that

> [a]lthough conventional techniques have permitted us to obtain some evidence concerning this narcotics trafficking group, the full scope of this group and the identities of all the individuals involved have not been revealed. In addition, we have only achieved a small understanding of the methodology for the distribution of the monies derived from the narcotics sales. Therefore, the requested electronic surveillance of certain communications and conversations is essential if we are to learn the identities of all the participants involved in the narcotics trafficking group and the full extent of their activities.[50]

### 2. The Bryan Federal Affidavit

As outlined in the Bryan Federal Affidavit, submitted in support of the Goldstein Application, the objectives of the Serrano investigation were to identify the extent and nature of the Serrano organization's methods of operation, the identities of the co-conspirators who had not yet been identified, the organization's source of drugs, and the locations where drugs and money

---

**45.** *Id.* ¶ 24 (emphasis added).

**46.** *Id.* ¶ 22(a) ("[I]n this investigation, the use of records and documents alone, if they are found, would not be sufficient to meet the goals of the investigation.").

**47.** *Id.* ¶ 23(a) & (b).

**48.** *Id.* ¶ 25.

**49.** *Id.* ¶ 30.

**50.** *Id.* ¶ 31.

were obtained and distributed.[51] As evidence that the Serrano Cellphones were used in furtherance of drug-trafficking, the Affidavit summarizes numerous calls intercepted by state investigators.[52] As with the Bryan State Affidavit, the Bryan Federal Affidavit alleges that "several other investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ."[53] Again, the drawbacks of each such investigative technique are discussed in detail.

While acknowledging the use of a confidential informant in the investigation, the Bryan Federal Affidavit claims that the CI's information, while helpful, would not have allowed law enforcement to accomplish the goals of this investigation.[54] This conclusion is based on the assumption that "narcotics organizations are generally highly-compartmentalized, and it is generally impossible for an informant to gain access to all aspects of an organization's illegal activities."[55] The Affidavit concludes that "[w]ith the limited information provided, to date, by the informant, and without the evidence obtained from court-authorized interceptions, the objectives of this investigation cannot be met."[56]

With regard to physical surveillance, the Affidavit indicates that state investigators learned through intercepts that Serrano conducted much of his drug-trafficking operation out of "East Coast Customs," an automobile detailing/electronics installation business located at 1160 Bronx River Road, Bronx, New York.[57] Another location used for drug-related activity was 2860 Bruckner Boulevard, Bronx, New York, a stash house where drugs and money were stored.[58] Both locations were purportedly difficult to survey without detection because Serrano was so highly surveillance-conscious.[59] Missing from the Federal Affidavit, however, is any allegation that surveillance became more difficult as a result of law enforcement's assistance to Serrano and his organization.[60]

Specifically, the location of East Coast Customs—in the middle of a block on a well-trafficked road—made surveillance difficult because there was no place for law enforcement to maintain surveillance for extended periods of time without detection.[61] In any event, surveillance of East Coast Customs was of limited use given the foot traffic into and out of the establishment, which made it difficult to differentiate legitimate customers from those involved with Serrano's drug trade.[62] Surveillance of 2860 Bruckner Boulevard was allegedly difficult "because of the location of the stash house, and because SERRA-

---

51. *See* Bryan Federal Affidavit ¶ 11.

52. *See id.* ¶¶ 31–44.

53. *Id.*

54. *See id.* ¶ 60 ("Confidential witnesses and informants alone would likely be inadequate to develop evidence about the TARGET SUBJECTS' suppliers and customers.").

55. *Id.*

56. *Id.*

57. *See id.* ¶ 27.

58. *See id.* ¶ 50.

59. *See id.*

60. *See id.* ¶ 16, n. 5 ("CS–1 also provided information about the alleged involvement of state law enforcement officers in narcotics trafficking activity. Law enforcement agents are still investigating this information, but have not been able to corroborate it.").

61. *See id.* ¶ 51.

62. *See id.*

NO is so surveillance-conscious." [63] The Affidavit then provides instances where Serrano identified surveillance vehicles in the vicinity of East Coast Customs and 2860 Bruckner Boulevard and accurately described those vehicles to his associates over the phone.[64] For these proffered reasons, increased surveillance would have alerted the target subjects to the existence of the investigation, causing them to cease their illegal activities, thereby hindering the investigation.[65]

The Affidavit also discusses other investigative techniques. Interceptions of pager communications were of limited use because they did not reveal the content of subsequent conversations.[66] Telephone toll records were also of limited use because they would not have enabled the DEA to identify with certainty other members of the conspiracy.[67] For the same reasons stated in the Bryan State Affidavit, the Bryan Federal Affidavit similarly discounts the efficacy of using a federal grand jury. Witness interviews were also rejected because the questioning of some co-conspirators would alert other co-conspirators which would "cause a change in their methods of operation before all of the co-conspirators are identified, thereby compromising the investigation and resulting in the possible destruction or conceal-ment of documents or other evidence...." [68] Search warrants were also alleged to be ineffectual given that the locations where drugs and money were received, hidden and distributed had not yet been completely identified.[69] Finally, arresting those few target subjects that had been identified was not a viable option as their unidentified co-conspirators would have ceased their illegal activities or would have changed locations.[70] For all of these reasons, the Bryan Federal Affidavit concludes that the interception of wire communications over the Serrano Cellphones was essential to uncovering the full scope of the instant drug conspiracy.[71]

## II. STATUTORY REQUIREMENTS

 The interception of conversations by use of electronic devices is a "search" within the meaning of the Fourth Amendment.[72] Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") [73] applies where the evidentiary use of wiretap evidence is in issue. "Title III incorporates the Fourth Amendment's protections by placing probable cause and particularity conditions on the issuance of a wiretap." [74] Accordingly, "[s]urveillance that is properly authorized and carried out under Title III complies with the fourth

---

63. *Id.* ¶ 52.

64. *See id.* ¶¶ 53–54.

65. *See id.* ¶ 55.

66. *See id.* ¶ 49 ("[I]ntercepted pager communications do not permit the DEA to learn what the TARGET SUBJECTS are communicating to each other with respect to the means, locations, and co-conspirators used by them to store, transport and distribute their illegal activities.").

67. *See id.* ¶ 56.

68. *Id.* ¶ 59.

69. *See id.* ¶ 62.

70. *See id.* ¶ 63.

71. *See id.* ¶ 67.

72. *See Berger v. State of New York*, 388 U.S. 41, 51, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

73. 18 U.S.C. §§ 2510 *et seq.*

74. *United States v. Segura*, No. 3:99CR85, 2001 WL 286850, at *3 (D.Conn. Feb. 27, 2001).

amendment." [75]

■ The federal procedures for electronic surveillance are governed by 18 U.S.C. § 2518 ("section 2518") while the New York State procedures are found in section 700 of the CPL.[76] Both contain a necessity requirement. Under New York state law, no eavesdropping warrant may issue absent "a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ." [77] An application for an eavesdropping warrant must contain "[a] full and complete statement of facts establishing that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ, to obtain the evidence sought." [78] Federal law requires that an application for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." [79] As a condition of authorizing electronic surveillance, the issuing court must determine that "normal investigative procedures have been tried and have failed or reasonably

appear to be unlikely to succeed if tried or to be too dangerous." [80]

"Neither the New York nor the federal statute requires that any particular investigative procedures be exhausted before a wiretap may be authorized. Wiretaps are neither a routine initial step nor an absolute last resort." [81] The necessity requirement in both the New York and federal statutes is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." [82] As explained by the Supreme Court, wiretaps "were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." [83] Thus, "an affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible." [84]

The statutory necessity requirement, however, "is far from an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult." [85]

---

75. *United States v. Bianco*, 998 F.2d 1112, 1121 (2d Cir.1993).

76. The federal and New York State statutory requirements for obtaining an electronic eavesdropping warrant are basically the same and there is no discernable difference between federal and state case law regarding these requirements. *See United States v. Lilla*, 699 F.2d 99, 102 (2d Cir.1983) ("Both require a showing that investigative procedures less intrusive than a wiretap have been tried or are unlikely to succeed if tried.").

77. CPL § 700.15[4].

78. *Id.* § 700.20[2][d].

79. 18 U.S.C. § 2518(1)(c).

80. 18 U.S.C. § 2518(3)(c).

81. *Lilla*, 699 F.2d at 104 (quotations and citation omitted).

82. *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

83. *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

84. *Lilla*, 699 F.2d at 103.

85. *United States v. Labate*, No. S1 00 CR 632, 2001 WL 533714, at *13 (S.D.N.Y. May 18, 2001) (quotations and citation omitted).

With regard to necessity, the Second Circuit has stated:

> [T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.[86]

■■■■ While generalized or conclusory statements that other investigative procedures would prove unsuccessful are insufficient to support a finding of necessity,[87] the application must be viewed in a practical and commonsense manner.[88] Furthermore, "[t]he issuing judge's determination that the Government has made adequate use of alternative investigatory techniques is entitled to substantial deference." [89]

## III. DISCUSSION

### A. Normal Investigative Procedures

Defendants argue that "[t]he initial state application for a wiretap fails to establish the necessity of electronic surveillance because it does not demonstrate either that the Government adequately pursued less intrusive investigatory methods, or that less intrusive methods would be unlikely to succeed if tried." [90] Defendant mount a two-pronged attack, arguing that the state and federal wiretap applications failed to demonstrate that the use of physical surveillance and confidential informants were unsuccessful or unlikely to succeed.[91]

### 1. Confidential Informant

■■■■ Defendants argue that the eavesdropping applications fail to adequately explain why the continued use of a confidential informant would have been unsuccessful in achieving the goals of the investigation.[92] Serrano claims that if the CI obtained information from Serrano regarding purported law enforcement protection, then the CI must have had wide-ranging access to Serrano's drug-trafficking operation.[93] However, it is perfectly plausible for the CI to have general knowledge that Serrano was receiving law enforcement protection without knowing the details of

**86.** *United States v. Torres*, 901 F.2d 205, 231 (2d Cir.1990) (quoting *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.1979) (quotations and citation omitted)).

**87.** *See Lilla*, 699 F.2d at 104.

**88.** *See Torres*, 901 F.2d at 231.

**89.** *United States v. Trippe*, 171 F.Supp.2d 230, 236 (S.D.N.Y.2001) (citing *United States v. Wilkinson*, 754 F.2d 1427, 1433 (2d Cir. 1985)).

**90.** Reply Memorandum of Law in Further Support of Defendant Juan Carlos Serrano's Motion to Suppress Electronic Surveillance Evidence ("Serrano Reply") at 1.

**91.** *See* Memorandum of Law in Support of Defendant Juan Carlos Serrano's Motion to Suppress Electronic Surveillance Evidence ("Serrano Mem.") at 6.

**92.** *See id.* at 17 ("In the short time that he operated as a confidential informant, the CI allegedly succeeded in conducting narcotics transactions directly with Mr. Serrano.... These alleged successes in a short amount of time demonstrate that the investigators did not sufficiently pursue the use of one or more confidential sources before resorting to more intrusive electronic surveillance.").

**93.** *See id.* at 15 ("If the CI were able to obtain this level of information from Mr. Serrano and the police believed him to be reliable, these circumstances directly contradict the claims made later in the applications that confidential sources would be unlikely to obtain sufficiently valuable information to obviate the need for electronic surveillance.").

Serrano's drug-trafficking organization. Serrano further claims that there is a fatal inconsistency in the eavesdropping applications in that the CI is cited as a reliable source of information regarding law enforcement protection and at the same time discounted as a source because he cannot ascertain the details of that protection, or the inner workings of the Serrano organization.[94] Again, it is perfectly plausible that Serrano told the CI that he received protection from law enforcement while not divulging the details of that protection, including who provided the protection, how much Serrano paid for it, and how it was arranged. I therefore find no inconsistencies in the eavesdropping applications with respect to the CI, the scope of his knowledge, and his allegations that Serrano received law enforcement protection.

Finally, defendants argue that continued use of the CI would have eliminated the need for electronic surveillance. But the CI only succeeded in purchasing an ounce of cocaine from Serrano. The CI did not have access to, or information about, Serrano's co-conspirators including Wilmer Serrano, Peter Gonzalez, Eric Martinez or Raul Martinez.[95] Nor did the CI have any knowledge concerning Serrano's methods of operations, including his use of East Coast Customs and 2860 Bruckner Boulevard.[96] In fact, the CI did not even know that Serrano operated in multi-kilo quantities in the Bronx as he only met with Serrano in Dutchess County.[97]

■ The Government does not have to exhaust the use of a confidential informant with limited knowledge before applying for a wiretap. For example, in *Lombardo,* the "confidential informant had not been able to provide information about the supply or storage of narcotics, or about the identities of many of the members of what investigators believed to be a broad organization." [98] The court held that the wiretap was authorized in accordance with the requirements of section 2518.[99] Similarly, in *United States v. Harris,* the Government chose not to rely on confidential sources because they had limited knowledge of the target suspects and their suppliers.[100] The court stated that "the government may rely on wiretap surveillance when other investigative methods have failed to reveal the identities of additional co-conspirators." [101] Furthermore, the secretive nature of the Serrano organization made it difficult for the Government to use conventional investigative techniques.[102] Given

---

94. *See id.* at 16 ("The Government cannot legitimately argue in eavesdropping applications that electronic surveillance is necessary because a confidential informant will be unable to obtain information about the inner workings of Mr. Serrano's alleged narcotics dealing, including whether he is receiving protection from law enforcement, and simultaneously cite that confidential information as the reliable source for the assertion that members of law enforcement are providing protection to Mr. Serrano.").

95. *See* Gov't Opp. at 21.

96. *See id.* at 22.

97. *See id.*

98. *United States v. Lombardo,* No. 98 CR 1180, 1999 WL 305096, at *6 (S.D.N.Y. May 14, 1999).

99. *See id.*

100. *See United States v. Harris,* No. 00 CR 105, 2000 WL 1206724, at *3 (S.D.N.Y. Aug. 24, 2000).

101. *Id.* at *3, n. 6.

102. *See Wilkinson,* 754 F.2d at 1434 ("This was no 'small time narcotics case' of the type faced in *Lilla,* where simple investigative techniques might have sufficed, but a far-flung conspiracy that was impenetrable except by sophisticated electronic means.").

the limited extent of his dealings with Serrano, it was impossible for the CI to obtain the well-guarded information needed to secure the arrest and conviction of Serrano and his co-conspirators.[103] Accordingly, the wiretap applications provided sufficient information regarding the use of confidential informants.[104]

## 2. Physical Surveillance

According to defendants, all electronic surveillance evidence obtained in this case should be suppressed because the wiretap applications failed to establish that physical surveillance would have been ineffective.[105] Defendants argue that "[t]he eventual success of physical surveillance in recovering the only narcotics alleged in the indictment belies the assertions in the wiretap warrant application that sustained physical surveillance would have been ineffective because Mr. Serrano was receiving police protection and employing counter-surveillance measures."[106] The Government effectively rebuts this argument by pointing out that the physical surveillance on May 26, 2005 was so successful because agents were listening to wire intercepts of Serrano brokering the deal as it was taking place.[107] "In other words, agents knew where to surveil—Wilmer Serrano's house—and when to conduct their surveil-lance—between approximately 8:30 p.m. and 11:00 p.m.—because they were listening to Juan Carlos Serrano orchestrate the drug transaction."[108] The assistance of electronic surveillance, therefore, made "the technique of physical surveillance more precise, and thereby minimized the risk of detection."[109]

Defendants cite *Lilla* as a case where the convictions of several defendants were reversed because the affidavit in support of the eavesdropping warrant failed to establish that other investigative methods would have been unsuccessful if tried. Defendants' reliance on *Lilla*, however, is misplaced. In *Lilla*, the bare-bones affidavit did not reveal what, if any, investigative techniques were attempted prior to the wiretap request.[110] "Instead, the affidavit merely asserted that 'no other investigative method exists to determine the identity' of individuals who might have been involved with Lilla."[111] The Affidavits in issue here, in sharp contrast, detail the investigative procedures that were previously used and describes the shortcomings associated with each.[112] As an example of the limitations of physical surveillance, the Affidavit notes that "surveillance entails a high risk that the suspects will detect the investigation."[113] As documented in the Bryan Federal Affidavit, Serrano's subse-

---

103. *See United States v. Sanchez–Flores*, No. 94 CR 864, 1995 WL 765562, at *5 (S.D.N.Y. Dec. 29, 1995) ("The Target Subjects were expected to speak with other members of the conspiracy outside the presence of the CI. The Target Subjects were not about to discuss all their sources of supply, their customers, and the manner in which they stored and distributed narcotics.").

104. *See id.* ("There is no requirement given the CI's limited success in obtaining information that the Government must rely exclusively on information and evidence that the informant generated.").

105. *See* Def. Mem. at 10.

106. *Id.*

107. *See* Gov't Opp. at 23.

108. *Id.*

109. *Segura*, 2001 WL 286850, at *8.

110. *See Lilla*, 699 F.2d at 104.

111. *Id.*

112. *See* Bryan State Affidavit ¶¶ 21–25; Bryan Federal Affidavit ¶¶ 47–63.

113. Bryan State Affidavit ¶ 24.

quent identification of surveillance vehicles at East Coast Customs and 2860 Bruckner Boulevard confirmed this drawback.[114] Physical surveillance was therefore difficult and of limited value.[115] The Government "must demonstrate only that normal investigative techniques would prove difficult. It need not show that any other option would be doomed to failure." [116] Furthermore, whether or not extended physical surveillance would have been successful is not, by itself, dispositive. "Neither the New York nor the federal statute requires that any particular investigative procedures be exhausted before a wiretap may be authorized." [117] Finally, the Second Circuit has "previously noted that 'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" [118]

Defendant Wilmer Serrano ("Wilmer") makes a broader, but similar, argument. Wilmer argues for suppression on the ground that traditional methods of investigation were entirely successful before the initiation of the wiretaps and, therefore, the Government cannot show the futility of such methods.[119] The strength of this argument depends on the definition of success. When state law enforcement began to intercept Serrano's Sprint Phone, the CI had only made one controlled purchase of a one-ounce quantity of cocaine from Serrano in Dutchess County. Most of the inner workings of the Serrano drug-trafficking organization were not yet known. For example, law enforcement had yet to identify many of Serrano's co-conspirators, the means and methods of Serrano's drug-trafficking activities, and the locations where Serrano conducted business.[120] When compared with the goals of the investigation as stated in the Bryan Federal Affidavit, the success of the investigation prior to the wiretaps was quite limited.[121]

For all of these reasons, the wiretap applications in issue sufficiently demon-

114. *See* Bryan Federal Affidavit ¶ 54.

115. *See United States v. Young,* 822 F.2d 1234, 1237 (2d Cir.1987) (stating that physical surveillance was impractical as it would likely be conspicuous and draw attention to the investigators); *Lombardo,* 1999 WL 305096, at *6 (upholding wiretap application which explained that "physical surveillance had proven difficult because the targets of the investigation moved frequently among several locations").

116. *United States v. Bellomo,* 954 F.Supp. 630, 638–39 (S.D.N.Y.1997).

117. *Lilla,* 699 F.2d at 104. *See also Lombardo,* 1999 WL 305096, at *5 ("That a wiretap applicant must disclose other investigative techniques already used or that might be successfully used does not mean that any particular investigative procedures or all other possible means of investigation must be exhausted before a wiretap may be authorized.") (citing *United States v. Miller,* 116 F.3d 641, 663 (2d Cir.1997)).

118. *Young,* 822 F.2d at 1237 (quoting *United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir.1975)).

119. *See* Wilmer Serrano Memorandum of Law ("Wilmer Mem.") at 3 ("In the instant case, so-called 'traditional' methods of investigation, such as physical surveillance, consensual recordings, and the use of confidential informants, were so successful and efficient in exposing the charged crimes that the wiretap applications simply could not demonstrate the futility of these methods.").

120. *See* Gov't Opp. at 27.

121. Nor were the Government's stated goals unreasonably broad. *See* Wilmer Mem. at 6–7; Memorandum of Law in Support of Omnibus Motion ("Vargas Mem.") at 6. Neither Wilmer nor Vargas cite any case law that circumscribes the Government's ability to define its investigative goals. In any event, I find the Government's stated goals to be reasonable. I therefore reject the claim that the Government somehow manipulated the necessity requirement by specifying exaggerated goals for the investigation.

strate that physical surveillance, without the assistance of electronic surveillance, was exceedingly difficult and unlikely to succeed.

> In cases such as this one, involving the investigation and prosecution of narcotics trafficking organizations, the Second Circuit has recognized the inadequacy of many of these normal investigative techniques and approved of the use of electronic surveillance. *See Torres,* 901 F.2d at 232 (confidential informants had minor role in overall scale of operation); *Young,* 822 F.2d at 1237 (physical surveillance impractical since it would likely be conspicuous and draw attention to the investigators); *United States v. Martino,* 664 F.2d 860, 868 (2d Cir.1981) (use of pen register information and toll records failed to identify participants to the conversation or other co-conspirators).[122]

In sum, I find that the wiretap applications provided sufficient information regarding ordinary investigative procedures, including physical surveillance and the use of confidential informants, and the reasons why they failed, were likely to fail, or were too dangerous. Thus, the wiretap applications meet all of the requirements of section 2518.

### B. False and Misleading Information

In a letter to the Court dated April 25, 2006, Mark P. Goodman, Serrano's attorney, calls attention to the fact that the Bryan Federal Affidavit states: "CS–1 also provided information about the alleged involvement of state law enforcement officers in narcotics trafficking activity. Law enforcement agents are still investigating this information, but have not been able to corroborate it." [123] The letter points out that neither the Weishaupt State Affirmation or the Bryan State Affidavit admits that investigators were unable to confirm that members of law enforcement were providing protection to Serrano. Serrano uses this information in a two-pronged attack on the validity of the wiretap applications.

*First,* Serrano argues that information about law enforcement protection was wrongly emphasized to justify the need for electronic surveillance. According to Serrano, the above information "not only indicates that the investigators wrongly emphasized the information that law enforcement officers were protecting Mr. Serrano as a justification for obtaining a wiretap, but also calls into question the reliability of the informant on other issues contained in the state application." [124] However, the state application does not state that investigators had confirmed that Serrano was, in fact, protected by corrupt law officers; rather, the application notes that law enforcement *may* be providing such protection. Furthermore, the application provides other reasons, such as Serrano's surveillance consciousness, as to why physical surveillance appeared unlikely to succeed. And while Serrano cites the portion of the Weishaupt State Affirmation which states that "[t]he dangerousness aspect is especially prevalent in this case given the information developed regarding the protection provided to this organization by members of the law enforcement community," he neglects to cite the following sentence which states: "The use of continued electronic surveillance is particularly important to determine what *if any* role law enforcement officials have

---

**122.** *Segura,* 2001 WL 286850, at *8.

**123.** *See* 4/25/06 Letter at 2.

**124.** *Id.* at 3.

in this operation." [125] Serrano's first argument is without merit.

*Second,* Serrano argues that the above information directly contradicts that portion of the state wiretap application which states that investigators had corroborated the CI's information.[126] The Bryan State Affidavit states that the "CI has further been corroborated by tape recordings of those conversations, as well as physical surveillances conducted by members of the DCDTF and the New York State Police CNET Unit. Moreover, independent investigation conducted by investigators assigned to this investigation has also corroborated the facts originally provided by the CI." [127] The first statement could mean that only the CI's transactions with Serrano have been corroborated, as the Affidavit provides details of such corroboration. However, the second statement is far broader and permits the inference that the Government submitted false or misleading information to the Court.

■■■ In order to prevail on a motion to suppress on this basis, Serrano must show that: (1) the warrant application contained false statements or omissions made knowingly and intentionally or with reckless disregard for the truth; (2) the omitted or misstated information was material; and (3) without the false or omitted material, the affidavit does not establish probable cause.[128] Serrano cannot meet the third requirement. Even without corroborating the facts originally provided by the CI,

there is still probable cause to believe that Serrano was engaging in illegal activity. Probable cause was established by the controlled purchase of cocaine by the CI from Serrano and the CI's two repayments of drug money to Serrano. These transactions were corroborated. Therefore, the potentially overbroad statement as to corroboration is immaterial given the actual corroboration that took place. Serrano's second argument is also without merit.

## C. Minimization

■■■ Defendant Vargas initially argued in favor of suppression on the ground that the Government failed to appropriately minimize the telephone calls it intercepted.[129] In his Affirmation in Reply, however, Vargas acknowledged that there was no electronic surveillance of any telephone instrument in which he had a possessory interest. Vargas therefore conceded that he does not have the legal standing to challenge the Government's compliance with the minimization requirements.

## D. Sealing

Defendant Vargas also seeks a hearing to determine whether state authorities delayed in sealing the records intercepted from January 28, 2005 through February 25, 2005, the first period of state-court authorized electronic surveillance over the Serrano Sprint Phone. Because there was no delay, this request is denied.

---

125. Weishaupt State Affirmation ¶ 7 (emphasis added).

126. *See id.* at 1.

127. Bryan State Affidavit ¶ 7.

128. *See Bianco,* 998 F.2d at 1125 (citing *Franks v. Delaware,* 438 U.S. 154, 170, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

129. 18 U.S.C. § 2518(5) provides in part: "Every order and extension thereof shall contain a provision that the authorization to intercept shall be ... conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."

Vargas points out that the Dutchess County District Attorney's Affirmation in Support of Sealing Order [130] states that only recordings captured on a cellular telephone with call number (646) 418–9327 (Phone # 2) had been stored on DVD–RAM and sealed. He claims that this proves that the cellular telephone with call number (646) 685–9250 (the Serrano Sprint Phone) was not properly sealed. However, an Amended Sealing Order and Affirmation in Support of Amended Sealing Order, which were filed on March 24, 2005, corrected the clerical mistake made in the original Affirmation by explaining that on February 25, 2005, DVD–RAM disks with the recorded communications over both the 9327 phone and the 9250 phone were sealed and placed in evidence. Thus, there is no issue with regard to sealing.

## IV. CONCLUSION

For the reasons stated above, the motions of Juan Carlos Serrano, Wilmer Serrano and Manoa Vargas to suppress all evidence seized electronically are denied. The Clerk of the Court is directed to close these motions (Documents # 25, 51 and 52). A status conference is scheduled for June 19, 2006 at 4:00 p.m.

SO ORDERED.

130. *See* Ex. E of Gov't Opp.